FILED
2014 Aug-05  AM 11:19
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHWESTERN DIVISION

LAURIE DAVIS,

      Plaintiff,

vs.                       CASE NO. CV-13-J-335-NW

LAUDERDALE COUNTY SHERIFF
RONNIE WILLIS, et al.,

      Defendants.

## **MEMORANDUM OPINION**

Plaintiff Laurie Davis has worked for the Lauderdale County Sheriff's department since 1996, and is still so employed. Davis depo. at 6. In late April 2012 plaintiff and the other deputies on that shift with plaintiff all complained to their supervisor, Sergeant David Ray, because Ray would spend most of his shift sitting in a restaurant, or sitting in a car with someone from the County Commission office.[1] Davis depo. at 28-30, 231. In response, David Ray told the shift they could "kiss his ass." Davis depo. at 32. Shortly thereafter, Sergeant Ray wrote a "to whom it may concern letter" on May 3, 2012, stating that "all members of the shift" brought to his attention on "several occasions" that plaintiff "could not have as much sick leave or

---

[1] Deputy Adkison asserts the shift had gone to defendant Witt about the amount of time defendant Ray was not available, and Witt told them to confront Ray directly. Adkison affidavit, ¶ 18. Ray told them "why couldn't he sit at the Restaurant all day since Jr. Witt was allowed to spend most of his time playing golf and going to the gym." Adkison affidavit, ¶ 18.

annual leave as she was taking."[2]  Exhibit 2 (doc. 45-6, p. 2).  The same day, May 3,

2012, plaintiff was summoned to Sheriff Ronnie Willis' office.  Davis depo. at 36-40.

She was informed Ray had  conducted an investigation by comparing the dispatch

schedule versus time cards versus the CAD schedule and found discrepancies of at

least 40 hours for the quarter in her claimed and actual worked time.[3]  *Id.*  Also on

May 3, 2012, plaintiff was placed on administrative leave pending an investigation

and ultimately required to work six days for which her pay was charged to her sick

and annual leave accounts.  Davis depo. at 54-55; exhibit 3 (doc. 45-6, p. 3).  When

asked why plaintiff thought this was discriminatory in favor of men, she responded

---

[2]By affidavit, defendant Ray specifically states that Deputy Adkison complained about plaintiff's use of sick leave, and that Adkison stated he was going to make a complaint to the Alabama Ethics Commission, which Ray construed to be a complaint against him.  Ray affidavit (defendant exhibit 5), ¶ 7.  Deputy Adkison testified he never raised this issue one on one with defendant Ray.  Adkison depo. at 76.  He stated that general conversations would arise in the squad room concerning various people and the time they took off, but he never pursued this against any deputy.  *Id.* at 76-77.  As far as a specific conversation with defendant Ray concerning a complaint regarding plaintiff, Adkison asserts no such conversation ever took place. *Id.* at 77-79.  When asked in deposition why he looked into plaintiff's time, Ray stated Steve Adkison, Shannon Abston, and Harry McGee made remarks, not complaints, and "it was just innuendo."  Ray depo. at 29.  Later in his deposition, Ray states he conducted his investigation into plaintiff's use of time "after Steve had threatened me with the Ethics Commission."  *Id*. at 36.  Thus, the court finds defendants' statement in their brief, that "Adkison informed Sergeant Ray that he would be making a complaint to the Alabama Ethics Commission" and how Ray construed those statements, not to be undisputed by the evidence.  Compare defendants' brief (doc. 41), at 5, with Adkison depo. at 76-77.

Meanwhile, Deputy Adkison also testified that Ray regularly went "ballistic" when someone did not show up for work, and that Adkison questioned how McGee, plaintiff, Clifford Whitten, and Thomas McClusky could have as much accumulated leave as they took, and how Joe Shanes could possibly work as much overtime as he claimed.  Adkison depo. at 44-46, 60.

[3]Nancy Sartain, the sheriff's administrative assistant, stated she was asked to pull all of plaintiff's dailies by Witt or Willis, but not asked to produce them for anyone else.  Sartain depo. at 21-22.

If you let a department run wild and you want to hone in on an officer for a  – which can be a secretary's mistake, my mistake, anyone's mistake.  You want to hone in on me, yet we've got a buck wild department, then there's a problem.  You know, there's videos of – there's people that have saw deputies up there with secretaries in the back doing things.  There's videos where they've went into the courtrooms having sex.  So, yeah, I think that if you're okay with deputies out here having sex and doing things while you're working and you – because this could have been a clerical error....

Davis depo. at 240.

Based on these facts, plaintiff filed an action for violations of her rights under 42 U.S.C. § 1983 and Title VII.[4]  Pending is the defendants' motion for summary judgment and supporting brief and evidence (docs. 40-41), to which the plaintiff submitted a response and further evidence (docs. 44-45) and the defendants thereafter filed a reply (doc. 47).

## I.  FACTUAL BACKGROUND

The dispute before the court is whether the plaintiff was singled out for the above described punishment based on her gender.  The defendants argue the plaintiff cannot establish she was treated disparately, because she has failed to name any similarly situated deputy treated differently than she was.  The plaintiff responds that defendants' distinctions are ones without meaning, because all deputies are subject

---

[4]Other claims brought by plaintiff in her Second Amended Complaint have been previously dismissed.  See Order November 5, 2013.  In her response to the defendant's motion for summary judgment, the plaintiff concedes that defendant's motion is due to be granted on her claim under the Equal Pay Act (Count VI) and her claim for Title VII Retaliation (Count VII). The court shall so rule by separate Order.

3

to the same rules and fulfill the same duties.  Because the defendants' representations as to the undisputed facts include many disputed facts, the court has carefully combed the evidence submitted.

Having reviewed all the evidence before the court, striking is the sheer volume of evidence produced by plaintiff demonstrating that the Lauderdale County Sheriff's Office time keeping system was in shambles.   The system was based on the deputies themselves turning in "dailies" for each day they worked.  Depo. of David Ray, at 22.  There was no time clock or roll call, rather each deputy simply radioed "dispatch" to make his or her availability to take calls known.  Affidavit of plaintiff (submitted as plaintiff exhibit 2 (doc. 45-15), ¶ 14; depo. of Ray. at 24, 26.  Because the "dailies" had to be turned into the courthouse, and because the deputies did not necessarily return to the courthouse at the end of every shift, the dailies were sometimes left at the courthouse at the start of a shift, or for a few days at a time prior to those shifts actually being worked.    Plaintiff depo. at 58-61; Patrick Davis depo. at 19-20; Adkison depo. at 58.  As explained by Cassandra Thompson, who was working in dispatch

> – the timekeeping thing was just so unorganized, because we kept a schedule in dispatch.  If a deputy called in, it was our job to report it to that shift supervisor and find somebody to cover the shift.  But our schedule could say one thing.  They kept a schedule in the sergeant's office, and it could have something else on it.  And then when we would log in – when we would log them in, whether it's via the phone or on the

radio, a lot of times some deputies didn't get logged in either because
we were busy at the time or – I can't speak for other dispatchers, but if
I knew somebody was scheduled to work and I didn't hear from them,
I made it my business to call them to see if they were working or not.

Thompson depo. at 29.

The problems with payroll records began when Nancy Sartain replaced Betty

Hoods as office administrator over payroll in the 2011-2012 time frame.[5]  Davis depo.

at 65; Sartain depo. at 11.  Plaintiff began completing her dailies on a weekly basis,

because Sartain repeatedly told the plaintiff she had lost them.[6]  Davis depo. at 65-66,

196.  Missing and lost dailies were common.  Sartain depo. at 34-35; Adkison depo.

at 155.

Sartain told plaintiff she went by the dispatch schedule for payroll, not the

dailies, because it was the most accurate.  Davis depo. at 67-68.  Plaintiff expected

Sartain would double check the dailies against the master schedule to make sure she

worked the hours reflected on the dailies, because Betty Hoods had done so.  Davis

depo. at 71.  The master schedule was created by the sergeants for each of their shifts,

and  would  be  marked  over  with  an  "S"  on  top  of  the  "E,"  "M,"  or  "W"  shift

---

[5]As explained by deputy Adkison, Sartain made a lot of mistakes when she began keeping
payroll records, which was about the time plaintiff was suspended for inaccuracies in her records.
Adkison affidavit, ¶ 23.

[6]Another deputy told plaintiff by text message that Sartain regularly lost dailies after
plaintiff, plaintiff's husband, and deputy Tracy Vanderford all received incorrect paychecks one
week.  Davis depo. at 189-190.  According to Sartain, she put in a lock box for the dailies
because the dailies "were disappearing."  Sartain depo. at 31-32.

assignment if someone called in sick.[7]  Davis depo. at 472-473; *see e.g.* exhibit 45-8 (p. 3-10); affidavit of David Ray (defendant exhibit 5), ¶ 6.  If the actual hours a deputy worked were needed, that information would be based on dispatch records. Ray depo. at 23.

The plaintiff asserts mistakes on the schedule were commonplace, the sergeant's version of the schedule would show different leave taken from that reflected on the dispatch schedule, and that because the sergeant's schedule was taped to the sergeant's desk, anyone had access to it to make changes.[8]  Plaintiff depo. at 473, 483-485;  Atkison depo. at 148, 150; Thompson depo. at 62-63.   The evidence is in conflict as to whether the schedule maintained by dispatch or the schedule maintained by the sergeants was the "master schedule."

At the start of each shift, each deputy that was working would call into dispatch and let dispatch know he or she was available to take calls.  On occasion, dispatchers failed to enter the plaintiff as working into the computer system.  Davis depo. at 486-491.  The schedules had mistakes in them with the days mixed up, and missing

---

[7]The letters correspond to the area of Lauderdale County the deputy was assigned for that shift; "E" being the eastern section, "M" being the middle section, including Florence, and "W" being the western portion of the county.

[8]According to Cassandra Thompson, dispatch maintained the master schedule and the sergeants had a copy of it.  Thompson depo. at 62-63, 70.  She stated deputies were to call dispatch if they were sick, but some called only the sergeant and some called only dispatch.  *Id.* at 64-65.  When Thompson was notified someone called in, she always contacted the shift sergeant because the sergeant would have to decide whether to find another deputy to cover that shift.  *Id.* at 65.

dailies, where Sartain would then ask deputies to turn in dailies for prior weeks worked.  Patrick Davis depo. at 27-28.  Plaintiff admits that at times, she called in sick on dates she had already turned in dailies in advance.  Plaintiff depo. at 75.  According to Sheriff Willis, the dailies were used to track hours, but the dispatch records of the deputies calling in that they were available for calls was used to verify who worked.  Willis depo. at 25.

Upon being accused of misusing leave, the plaintiff went to Sartain and questioned whether she corrected the dailies. Davis depo. at 85.  Sartain responded that she recorded the deputies' time exactly as it was turned in on the dailies, and not what was worked according to dispatch.[9]  Davis depo. at 85; Sartain depo. at 20.

After plaintiff was placed on leave on May 3, plaintiff's husband, also a deputy, spoke with Chief Deputy Witt, who stated he did not think plaintiff had done anything wrong, but alleged Sergeant Ray would not "let it go."  Plaintiff depo. at 82-83; Patrick Davis depo., at 16.

---

[9]Sartain testified she was not required to compare the dailies to the schedule in Dispatch until after the issues with plaintiff's time arose.  Sartain depo. at 19.  However, she then testified that on one occasion, plaintiff had a daily showing she worked 8 hours while the dispatch schedule reflected an "S" for "sick leave" written on top of the shift plaintiff was supposed to work.  *Id.* at 25-26.  Therefore, the court has evidence before it that Sartain both did and did not check the Dispatch records against the Dailies. *See also* depo. of Thompson at 71, 75 (stating that Sartain always compared the dailies to the dispatch schedule.).  Sartain testified that after plaintiff was reprimanded, she was specifically instructed by Witt and Willis to compare the dailies to the dispatch schedule.  Sartain depo. at 41.

On May 9, the plaintiff was summoned to the Sheriff's office by Chief Deputy Witt.  Plaintiff depo. at 88.  She agreed to "repay" 48 hours based on the number of hours the defendants presented to her, because she was trying to keep her job. Plaintiff depo. at 78, 94-96; exhibit 8 (doc. 45-6, p. 11-12).  Although defendant Willis alleged plaintiff did not contest this or assert she was being treated unfairly (Willis affidavit (defendant exhibit 6) , ¶ 13), the plaintiff claims she tried to point out inconsistencies in the record, but Chief Deputy Witt became irritated so she just agreed to the number defendant presented.[10]  Plaintiff depo. at 78.  At least one day where she was shown as "off" she actually worked, and the dailies for several of the days when she was accused of calling in sick were not in her handwriting.  Patrick Davis depo. at 24-25.

Plaintiff was told she would have to work but record herself not at work to pay back time.  She told Witt and Sheriff Willis that she did not do anything intentionally and they both said they knew that it was a mistake.  Plaintiff depo. at 89-90; Willis depo. at 119-120, 123-124.  In addition to having to work for 48 hours while having the time deducted from her sick and annual leave, the plaintiff was also given a 12 day suspension without pay.[11]  Plaintiff depo. at 99; exhibit 10 (doc. 45-6, p. 13).

_____

[10]Plaintiff explained she had just learned she was pregnant and did not want to get upset. Plaintiff depo. at 96.

[11]The Notice of Reprimand containing the 12 day suspension was given for "Conduct Unbecoming an Employee, Knowingly and wilfully making a false statement, or entry in any

Thus, plaintiff worked for six days  for which she was compensated out of her sick and annual leave, although she was actually present at work.  Plaintiff depo. at 102-103, 136-137; exhibit 4 (doc. 45-6, pp. 4-6); exhibit 32 (doc. 45-11, pp. 1-2).

Evidence supports plaintiff's allegations that turning in dailies early was commonplace.  Deputy Adkison estimates that 80% of the deputies turned them in early or had someone else complete them, Sartain approved this practice, and that when a daily was missing, often the payroll person would just fill one out.  Adkison affidavit, ¶ 21.  For example, a memo from the 2012 Christmas holiday time period instructed the deputies to turn in their dailies three days early, and informed them that if anyone was then sick during those days, the paycheck for the following pay period would be adjusted accordingly.  Davis depo. at 73; exhibit 7 (doc. 45-6, p. 10).  A memo from 2009 instructed deputies not to turn in their dailies on a weekly basis, but rather to turn them in at the end of every shift.  Exhibit 6 (doc. 45-6, p. 9).  Additionally, the deputies would sign and turn in each other's dailies.  Davis depo. at 79-80; Vanderford affidavit (plaintiff exhibit 3 (doc. 45-18)), ¶ 7.  The dailies did not record the actual time worked, and the deputies sometimes would turn in a daily, start to go home, and then respond to additional calls in overtime.  Plaintiff depo. at 168.  Sartain added that due to the way the pay periods ran, any time there was a

---

report or record."  Exhibit 10 (doc. 45-6, p. 13).

Monday holiday, deputies would have to turn in dailies the preceding Friday morning for scheduled work that Friday and Saturday.  Sartain depo. at 38-39.  She also noted that if the deputies filled out dailies for Saturday on Friday, then called in sick to dispatch, "it very well could have slipped through the cracks because, you know, by coming back off of a holiday, I would be focused on the pay period forward...." Sartain depo. at 40-41.

Upon being asked if she knew anyone else who turned in a daily in advance and then did not work those hours, the plaintiff volunteered that Thomas McCluskey did the same thing.  Davis depo. at 109-100, 203-204.  She added that he might have been noting his leave on his dailies, but Sartain missed his notes and recorded him as working when he was not.  Rather than requiring him to "repay" the improperly paid hours, the matter concerning McCluskey was dropped.   Davis depo. at 115. McClusky was paid for three days as having worked although he was on leave. Adkison affidavit, ¶ 23.   McClusky, an investigator, also refused to respond to a burglary call in December 2012 and plaintiff learned he was in a parking lot with the sheriff at the time, selling unlicensed Alabama merchandise.  Plaintiff depo. at 274-276.  Similarly, Terry Woods, a deputy,  was paid as working for time he spent bush hogging Sheriff Ronnie Willis' hunting property.  Plaintiff depo. at 116-117.  Terry Woods was also paid for working on Sundays while he was attending church.

Plaintiff depo. at 119-120.   Deputy David Terry also got paid for time he told the dispatcher to keep him logged in, but that he would not be taking any calls, because he was at boy scout camp with his son.[12]   Plaintiff depo. at 120-121, 174; Adkison affidavit, ¶ 29.   Deputies James Distefano and David Terry would go home during time they were getting paid to work.   Plaintiff depo. at 205-208; Patrick Davis depo. at 44.   Deputy Clifford Whitten would  get haircuts or go to doctors' appointments while getting paid for working.   Adkison affidavit, ¶ 25.   According to defendant Ray, as long as a deputy had his or her uniform on and was available for a call, they could be anywhere they wanted.   Ray depo. at 65.

The plaintiff also pointed to defendant Witt as having gotten paid for time he was not actually working.[13]   Plaintiff depo. at 169, 218.   Sergeant Ray would sit at a restaurant every day and not answer calls during that time.   Plaintiff depo. at 225. In sum, male deputies were allowed to submit inaccurate time records and received unearned compensation without reprimand.   Adkison affidavit, ¶ 24.

Although plaintiff had agreed to be penalized 24 hours of sick leave and 24 hours of annual leave, that agreement had to be amended because the defendants

---

[12]Ray alleged when he learned about this, he made Deputy Terry use 1.5 hours of leave time. Ray depo. at 61-62.

[13]Witt was fined by the Alabama Ethics Commission for playing golf while on duty. Davis depo. at 221-222. According to deputy Adkison, Witt was so frequently unavailable, the deputies had to call the City of Florence for back up because Witt was playing golf and hence unavailable to assist them. Adkison affidavit, ¶ 19.

learned plaintiff did not have 24 hours of sick leave to deduct.[14]  Davis depo. at 125;

exhibit 13 (doc. 45-6, p. 16).  The plaintiff informed defendant Witt that she wanted

the attorney she had hired to look at the amended agreement.  *Id.* at 126.  The plaintiff

was told that would be fine, but also told that if she did not sign the agreement should

would no longer have a job.  *Id.* at 127, 129-130.

At deposition, having reviewed the records, Sergeant Ray stated that January

23, 2012, February 11, 2012, March 11, 2012, April 5, 2012, and April 13, 2012,

were the dates in issue.[15]  Ray depo. at 42.  Upon examining the records, Ray agreed

there was no discrepancy on January 23.[16]  The master schedule reflected the plaintiff

worked that date, the daily reflected she worked that day, and the payroll reflected she

was paid for having worked that date.  Ray depo. at 43-44.  The same was true for the

documentation of February 11, 2012.  Ray depo. at 45.  However, Ray then asserted

that the master schedule was not the real master schedule from his desk, but he did

not know where that schedule would be, or what happened to all of them.  Ray depo.

---

[14]The amended agreement charged her 34 hours of annual leave and 14 hours of sick leave.  Davis depo. at 131-132.

[15]The court notes this is only five days, although the plaintiff was penalized for six.

[16]Although each of the defendants agreed that the sergeant schedule often differed from the dispatch schedule, and that the dispatch schedule was the more accurate of the two, the defendants rely in their brief on Ray's affidavit statements that he compared her pay cards to his own schedule.  Defendants' brief, at 6.  Given that sheer volume of testimony before the court that the sergeant's schedule was often wrong, the court finds whether Ray's action in using his own records rather than the dispatchers' was reasonable to be a genuine issue of material fact.

at 46-49; 79-80.  In conducting his investigation, Ray never checked to see if his schedule matched the one maintained in dispatch.  *Id*. at 50-51.  He also recounted a conversation when plaintiff told him she had not been logged in by dispatch, and he told her that the system was only as good as the people running the computer, but he "knew she was there so...."  *Id.* at 74-75.  Additionally, although accusing plaintiff of taking six days of sick leave while getting paid for working, Ray admittedly only checked two of those days against the dispatch records reflecting whether or not plaintiff reported she was available for calls.  Ray affidavit, ¶ 17.

Similarly, Sheriff Willis noted that on January 23, 2012, the daily stated she was sick, and the master schedule reflects that she worked the middle section of the county that day.  Willis depo. at 47.  He agreed that plaintiff claimed she worked 8 hours, one schedule showed her working 8 hours, and another schedule showed she was sick that day.  *Id.* at 53. Willis stated that the master schedule showing that plaintiff worked on January 23 was not the same schedule defendant Ray brought to him, because Ray maintained his own schedule.  *Id.* at 55.  On January 16, the master schedule showed plaintiff was scheduled off, yet completed a daily for that day.  *Id.* at 59.  On February 11, 2012, the plaintiff again turned in 8 hours on a daily, the plaintiff was not logged into the system by dispatch, but the master schedule reflects she worked the western section of the county.  *Id.* at 60-61.  On March 11, 2012, the

13

master schedule reflected the plaintiff was out sick, although a daily was turned in for that date. *Id.* at 63-64. The prior day, March 10, 2012, there are two dailies for the plaintiff, one showing 8 hours, one showing nine hours, and in two different handwritings. *Id.* at 65-66. On April 25, 2012, the plaintiff was marked as "sick" on the master schedule, but turned in a daily stating she worked 9 and a half hours, including a theft at a church. *Id*. at 69.

The plaintiff was the only employee disciplined for discrepancies in her time, although other deputies had similar time issues. Tracy Vanderford stated by affidavit that during the same time period plaintiff was accused of being off work while not using sick leave, his time records showed errors on ten different dates. Vanderford affidavit, ¶ 8. Patrick Davis, plaintiff's husband and a fellow deputy, identified six dates during that time period where his paycheck included hours for dates he was not working or regular pay hours for time he was on holiday leave. Patrick Davis affidavit (plaintiff exhibit 4 (doc. 45-20)), ¶ 15. Deputy Steve Adkison discussed problems with the time and record keeping in the sheriff's department with Travis Clemmons, Adkison affidavit, ¶ 16 (plaintiff exhibit 5 (doc. 45-25)). On February 25, 2012, one schedule had deputy McGee working while another schedule showed him on leave, forcing Adkison to cover the entire county. Adkison affidavit, ¶ 17.

14

Deputies Joe Shanes, Harry McGee, Clifford Whitten, Thomas McCluskey, and defendants Ray and Witt all had questionable leave and overtime practices, but plaintiff was the only one ever investigated.  Adkison affidavit, ¶ 20.  Adkison noted on one date, one schedule showed him working while another was blank; he was paid regular pay on a date he knew he was on leave; on another date one schedule showed him working while the other had him on annual leave; still another date for which he received regular pay the master schedule showed an "E" with an "L" over it, although the other schedule had an "M" with a "C" over it (for comp time). Adkison affidavit, ¶ 40. Yet another date, during the same time period as plaintiff's records were wrong, both schedules show he was working although he received annual leave; and on another date, for his scheduled off day he was shown as having taken sick leave.  *Id.*

Errors in scheduling were typical, although plaintiff was the only person ever reprimanded for those inconsistencies.  Adkison affidavit, ¶ 40.  Defendant Willis claimed by affidavit to have no knowledge of any other deputy submitting a daily for a day he or she was actually on sick leave.  Willis affidavit, ¶ 17.  Yet in his deposition, Willis did allow for the fact that the plaintiff was not the only deputy to have discrepancies.  Willis depo. at 42-43.  However, she was the only one to be investigated, and he notified both the Lauderdale County District Attorney and the Alabama Bureau of Investigations about her alleged theft of time.  Willis depo. at 37-

15

38.   Similarly, he asserts no one has filed a written complaint against anyone but plaintiff claiming a deputy failed to properly record sick leave.   Willis affidavit, ¶ 23.

Ray states the plaintiff was the only person he investigated at the time, but on a prior occasion he did look into Harry McGee's use of comp time.   Ray depo. at 57. Ray alleged there was no other deputy whose time was in question.   Ray depo. at 58-59.

The plaintiff alleges after her suspension and working against her accrued sick and annual leave, she ended up on Family Medical Leave Act ("FMLA") leave due to the stress of her job situation.   Plaintiff depo. at 157.   The plaintiff alleges she told her doctor about defendant Ray making inappropriate comments, cussing at her, her suspension, and harassment by Ray when she returned to work.   Plaintiff depo. at 158.   According to plaintiff, she had gone to defendant Witt "three or four times in tears asking him and begging him to get David Ray off me, and he wouldn't." Plaintiff depo. at 160.   The plaintiff also alleges that Sheriff Willis would not intervene when she complained about defendant Ray because

> He would not go against whatever David Ray wanted to do to me.   If David Ray was holding over his head that it's going to come out in public that you're forcing employees to look at their boobs.

16

Plaintiff depo. at 535.  Thus, the plaintiff believes the whole investigation into her time was begun by defendant Ray and that defendant Willis did not intervene because defendant Ray was blackmailing him.  Plaintiff depo. at 535-536.

The plaintiff contends that after learning she was pregnant, Ray chastised her for taking light duty.  Plaintiff depo. at 163.  He would make comments that women should be home cooking and had no business in the sheriff's department.  Plaintiff depo. at 346.  Although plaintiff never reported this behavior to defendant Willis (Davis depo. at 163-164), she did report it to defendant Witt, who informed her going to David Ray about it would just "make it worse."  Davis depo. at 301.

## II.  STANDARD FOR EVALUATING SUMMARY JUDGMENT

A moving party is entitled to summary judgment if there is no genuine issue of material fact, leaving final judgment to be decided as a matter of law. *See* Federal Rule of Civil Procedure 56; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587, 106 S.Ct. 1348, 1355-56 (1986).  An issue is "material" if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case.  It is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party.  *Allen v. Tyson Foods, Inc*., 121 F.3d 642, 646 (11th Cir.1997).

The facts, and any reasonable inferences therefrom, are to be viewed in the light most favorable to the non-moving party, with any doubt resolved in the nonmovant's favor. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158, 90 S.Ct. 1598, 1609 (1970). Once met by the moving party, however, the burden shifts to the non-moving party to come forward with evidence to establish each element essential to that party's case sufficient to sustain a jury verdict. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1080 (11th Cir.1990).

A party opposing a properly submitted motion for summary judgment may not rest upon mere allegations or denials of his pleadings, but must set forth specific facts showing that there is a genuine issue for trial. *Eberhardt v. Waters*, 901 F.2d 1578, 1580 (11th Cir.1990). In addition, the non-moving party's evidence on rebuttal must be significantly probative and not based on mere assertion or be merely colorable. *See* Rule 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50, 106 S.Ct. 2505, 2511 (1986). Speculation does not create a genuine issue of fact. *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir.2005).

The court must consider the evidence in the light most favorable to the plaintiff and may not make credibility determinations nor weigh the parties' evidence.

*Frederick v. Sprint/United Management Co.* 246 F.3d 1305, 1311 (11th Cir.2001);

*Stewart v. Booker T. Washington Insurance*., 232 F.3d 844, 848 (11th Cir.2000).

### III.  LEGAL ANALYSIS

A plaintiff may prevail on an employment discrimination claim by either proving that intentional discrimination motivated the employer or producing sufficient evidence to allow a rational trier of fact to disbelieve the legitimate reason proffered by the employer, which permits, but does not compel, the trier of fact to find illegal discrimination.  *Wilson v. B/E Aerospace, Inc*,. 376 F.3d 1079, 1088 (11th Cir. 2004), citing *Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 147-48, 120 S.Ct. 2097, 2108-09, 147 L.Ed.2d 105 (2000).

The plaintiff alleges she was treated differently than male deputies who engaged in conduct similar to her own.  Having applied the three prong test fashioned by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817 (1973), as required for circumstantial evidence, the court finds plaintiff's allegations raise a genuine issue of material fact.  *See also Texas Department of Community Affairs v. Burdine,* 450 U.S. 248; 252-253; 101 S.Ct. 1089, 1093-1094 (1981).  The oft cited test requires the plaintiff establish a *prima facie* case of discrimination, *McDonnell Douglas Corp.,* 411 U.S. at 802, 93 S.Ct. at 1824, creating a presumption that the employer unlawfully discriminated against the employee.

*Burdine*, 450 U.S. at 254, 101 S.Ct. at 1094; *Combs v. Plantation Patterns*, 106 F.3d 1519, 1527-1528 (11th Cir. 1997).   The burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the alleged discriminatory employment action. *Harris v. Shelby County Board of Education,* 99 F.3d 1078, 1083 (11th Cir.1996).

Finally, the plaintiff must offer evidence to show that the defendant's articulated reason was a pretext for discrimination.  An employer's stated reason is not a pretext unless it is shown that both: (1) the reason was false; and (2) the real reason was unlawful. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).  A plaintiff may show a pretext either "directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Jackson v. Ala. State Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir.2005).  The focus of the case after the defendant meets its burden of production is on the defendant's subjective intent and the motivation behind the defendant's adverse employment action directed at plaintiff.  *Harris*, 99 F.3d at 1083.

To establish a prima facie case of disparate treatment pursuant to Title VII , the plaintiff must show: (1) she is a member of a protected class; (2) she was subjected to adverse employment action; (3) her employer treated similarly situated employees

outside her class more favorably; and (4) she was qualified to do the job.[17] *Maniccia*

*v. Brown*, 171 F.3d 1364, 1368 (11th Cir.1999).  In determining whether the

comparator employees were similarly situated, the court must consider whether they

were involved in, or accused of, the same or similar conduct and disciplined

differently. *Id.* "To show that employees are similarly situated, the plaintiff must

show that the employees are similarly situated in all relevant respects...." *Knight v.*

*Baptist Hosp. of Miami, Inc.*, 330 F.3d 1313, 1316 (11th Cir.2003).  Misconduct

merely similar to that for which the plaintiff was disciplined is not sufficient. *Rioux*

*v. City of Atlanta*, 520 F.3d 1269, 1280 (11th Cir.2008).

The only issue before the court on the plaintiff's prima facie case is whether

plaintiff was treated differently than similarly situated male deputies.  The plaintiff

identified a substantial number of male deputies whose dailies and time sheets did not

match.  Although the defendants try to distinguish each of those individuals by stating

the deputy in question had different job duties, the plaintiff convincingly argues, and

provides evidence, that all deputies had identical job duties.  Rather than support the

defendants' argument that every deputy identified by plaintiff had different job duties,

the evidence could be interpreted by a jury as proof that a different set of rules were

---

[17]Analysis of a disparate treatment claim under § 1983 is identical to the analysis under Title VII where the facts on which the claims rely are the same. *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir.2008).

applied to plaintiff than the male deputies.  Given that the faults with the time system were wide-spread and well-known, given that other deputies submitted affidavits that their time records reflected multiple inconsistencies between their dailies, the master schedule, and their paychecks, and given that defendants admit that some of the dates for which plaintiff was accused of getting paid for regular time while out sick plaintiff was actually working, the court finds sufficient issues of genuine fact concerning whether the plaintiff identified male deputies similarly situated to the plaintiff remain for a jury to decide.

The court also finds the distinction by defendants that Sheriff Willis received no other written complaints other than the one concerning plaintiff to be of no assistance to defendants.  Given that Ray took his allegations about plaintiff to Willis, and that Willis told Ray to put those complaints in writing, the court surmises that a jury could find that Ray verbally took similar issues concerning male deputies to Sheriff Willis and that Willis did not act on them.  Similarly, a finder of fact could conclude that Ray was aware of multiple abuses of time by the deputies he supervised, but only took his complaints about plaintiff to Willis.

Thus finding the plaintiff has established at least a jury question concerning whether any of the identified male deputies were indeed similarly situated, the court next considers whether the defendants have established a legitimate reason for their

actions.  The defendants assert that Willis had an abundance of evidence to support Ray's allegations against plaintiff, and thus Willis' decision was reasonable.  Setting aside the hindsight knowledge that to date defendants lack any ability to conclusively establish whether or not plaintiff actually worked or called in on the dates in question, Willis agreed that the dailies were inaccurate and the two maintained schedules did not match.  *See* Willis depo. at 47,  53.  Although Willis seeks to rely on Ray's schedule, multiple deponents agreed that Ray's schedule was quite often inaccurate, and that the inaccuracies were well known.  Therefore, the court finds Willis' reasonableness in relying on Ray's schedules and representations is a question for the trier of fact.

Whether or not plaintiff actually abused the time system is not relevant to the issues before the court.  Rather, the question before the court for purposes of the pending motion is whether Willis' reliance on Rays assertions in disciplining plaintiff was reasonable, or whether is was a pretext for discrimination.  Even if the court could,  at this time, find Willis' actions to have been legitimate and non-discriminatory,  the plaintiff has "come forward with evidence sufficient to permit a reasonable fact finder to conclude that the legitimate reasons given by the employer were not its true reasons, but were a pretext for discrimination." *Vessels v. Atlanta Independent School System*, 408 F.3d 763, 771 (11th Cir. 2005).  Because of the wide-

spread knowledge that the time system the County used was so decrepit, plaintiff has raised a genuine issue of fact concerning whether the investigation and subsequent suspension of just her was based on her gender.[18]  *See e.g., Elrod v. Sears, Roebuck and Co.*, 939 F.2d 1466, 1470 (11th Cir.1991) (explaining that plaintiff cannot create a triable pretext issue by raising a question about the correctness of the facts underlying an employer's explanation without impugning the employer's honest belief that those facts are true).  Here, plaintiff has produced voluminous evidence which questions Willis' claim of a good faith belief that plaintiff was the only employee whose dailies and time sheets did not correspond.

The court shall deny summary judgment on plaintiff's claims of disparate treatment gender discrimination under Title VII, and § 1983 in Willis' individual capacity.[19]  However, the court finds the defendants' argument that plaintiff is not seeking prospective relief to be well-taken *(see* defendants' brief, at 42), and the plaintiff did not respond to this portion of defendant's brief.  Because the plaintiff seeks only monetary relief for her claims against defendants, not injunctive relief, the

---

[18]The court finds the testimony concerning how Ray's attitude toward plaintiff changed after plaintiff's first pregnancy, and his attitude toward her during her second pregnancy bolster this determination.

[19]As set forth herein, the court has found genuine issues of material fact concerning whether a violation of plaintiff's constitutional rights to be free of gender discrimination has occurred, and declines to repeat that analysis here.  As to whether a reasonable sheriff under similar circumstances should have known his actions violated clearly established law, the court has found too many genuine issues of fact as to what Sheriff Willis knew or should have known to make such a determination on a motion for summary judgment.

24

court shall grant defendants' motion for summary judgment for plaintiff's claim under § 1983 against all defendants in their official capacities.

Because plaintiff concedes the defendants' motion on her claims under the Equal Pay Act and for Retaliation is due to be granted, the court shall so rule by separate order.

### IV. CONCLUSION

Based on the foregoing, the court shall **DENY** the defendants' motion for summary judgment (doc. 40) as to plaintiff's claim under Title VII and § 1983 against defendant Willis in his individual capacity only.   The court shall **GRANT** the defendants' motion for the reasons set forth above as to plaintiff's Equal Protection claim, Retaliation claim, and for prospective relief pursuant to § 1983.

**DONE** and **ORDERED** this the 5th day of August, 2014.

INGE PRYTZ JOHNSON
SENIOR U.S. DISTRICT JUDGE